## IN RE VOSS.

**State's Attorney—Duty of.**

It is the duty of attorneys and counselors at law to maintain the respect due to courts of law, and to refrain from offensive language, either towards the court, counsel, or witnesses.

**Violation of Duty.**

A state's attorney who renders professional asistance to a defendant in a criminal action violates his duties as state's attorney and his duties as an attorney at law.

**Frequenting Gambling Place a Violation of Official Oath.**

A state's attorney, who, on several occasions, enters a public gambling house, and bets money on a roulette wheel, or gambles for money there, and wilfully refrains from informing and prosecuting the keeper of such place, is guilty of a ·misdemeanor involving moral turpitude, as such failure to inform and prosecute such keeper involves the violation of an official oath and the violation of the express command of section 7243, Rev. Codes 1899.

**Justice of the Peace not Bound to Dismiss a Prosecution on Motion of State's Attorney.**

A justice of the peace is not bound, as a matter of duty, to dismiss a prosecution of a criminal offense on motion of the state's attorney, although such a course may, in the absence of ·special circumstances or conditions known to him, be the better course to pursue.

**Official Misconduct—Sufficient to Warrant Disbarment.**

A state's attorney of this state who neglects to prosecute offenders against the prohibition law, when the proofs of such violations are furnished to him, is, under section 7620, Rev. Codes, guilty of a misdemeanor, and, such misdemeanor is one involving moral turpitude, authorizing disbarment or suspension. In re Simpson, 83 N. W. 541, 9 N. D. 379, followed.

**Suspension from Practice—Evidence Sufficient.**

Evidence in this case considered, and found to justify the suspension of the defendant from practising as an attorney at law, by virtue of his license, for neglect to prosecute to judgment proceedings instituted by him for .the abatement of nuisances created by violations of the prohibition law of this state as enacted in .chapter 63, Rev. Codes 1899.

**Adverse Local Sentiment will not Excuse State's Attorney from Good Faith Attempt to Perform his Duty.**

A state's attorney is not excused from performing his official duties as state's attorney because local sentiment ,largely predominates in favor of the nonenforcement of laws that have been violated, nor is he .excused from in good faith attempting to perform such duties because convictions are difficut to obtain.

In· the matter of the accusations against H.. G. Voss, attorney and counselor at law. Judgment of suspension.

*Newton & Smith,* for prosecution.

*Tracy R. Bangs* and *E. C.. Rice,* for defendant.

Morgan, J.  In September, 1900, affidavits were presented to the Bar Association of this state, charging the defendant with violations of his duty and obligations as an attorney at law and as state's attorney of Morton county.  The Bar Association appointed a committee, consisting of three of its prominent members, to investigate the charges contained in such affidavits and report thereon to such association.  This committee subsequently presented its report to such association and presented to the supreme court an accusation against the said defendant, specifically charging him with misconduct as an attorney at law and as state's attorney, and asked that the supreme court order a judicial investigation of such charges in the manner provided by law.  The accusation thus presented to the supreme court by such committee contained charges against said defendant as follows, to-wit:  First.  That in and during the month of January, 1898, there were certain persons and firms, to the number of about 12, engaged unlawfully in selling, furnishing, and giving away intoxicating liquors in the city of Mandan, in said Morton county, N. D., and unlawfully keeping and maintaining places where such unlawful sales, furnishings, and giving away were carried on and conducted in the said city and county, and to the knowledge of the said H. G. Voss, state's attorney aforesaid; that the names of such persons and firms are unknown to this committee, except as hereinbefore shown; that proceedings and prosecutions were and had been commenced against such persons and firms, under the provisions of the prohibition law of the state of North Dakota, by said H. G. Voss, then state's attorney of said Morton county, and were pending on the 6th day of January, 1898; that thereupon certain persons applied to the above-named H. G. Voss, he then and there being state's attorney of Morton county, for relief and protection against such prosecutions; that thereupon, on or about the 6th day of January, 1898, a meeting of certain citizens of said Morton county was held in said city of Mandan, at which meeting said H. G. Voss, then being state's attorney as aforesaid, was present and participated; that the said H. G. Voss, at such meeting, then and there informed the persons present, and advised, that upon the said persons and firms so engaged in unlawfully selling, furnishing, and giving away intoxicating liquors, as hereinbefore shown, and unlawfully keeping and maintaining  places wherein such unlawful sales, furnishings, and giving away were carried on and conducted, paying the sum of $17.50 each, as and for certain expenses theretofor and up to such time incurred by said Morton county or the officers, as the costs and expenses, and especially sheriff's fees, in such proceedings and prosecutions, such persons and firms so engaged in such unlawful selling, furnishing, and giving away intoxicating liquors, and being proceeded against as hereinbefore shown, should and would be relieved and protected from such proceedings, and their further prosecution discontinued; that thereupon a committee of residents of such Morton county, upon the advice of said H. G. Voss, he then and there being state's attorney, as above shown, was selected and authorized to collect of and from each of such persons and firms so

engaged, as hereinbefore shown, in unlawfully selling, furnishing, and giving away intoxicating liquors, the said sum of $17.50 each; that thereupon said sums were collected of and from said persons and firms to the number of about 11, and from all such persons, and by them paid, except one, Herman Yunck; that said Herman Yunck refused to pay such sum, or any sum, on account of such purpose, or for the purpose hereinbefore shown; that thereafter the said proceedings and prosecutions of said persons and firms to the number of about 11, on account of such unlawful acts as hereinbefore shown, were thereupon dropped, and not further prosecuted by the said H. G. Voss, state's attorney as aforesaid, or otherwise, except that the proceeding and prosecution against said Herman Yunck was further pressed and moved by the said H. G. Voss, as state's attorney, but to what extent is unknown to this committee; that after and in pursuance to the proceedings hereinbefore shown the said persons so unlawfully engaged in selling, furnishing, and giving away intoxicating liquors unlawfully were permitted by the said H. G. Voss, as state's attorney as aforesaid, to continue such unlawful business, and so did. Second. That on or about the 17th day of June, 1895, there was a criminal complaint and action pending before Frank Wilder, Esq., a justice of the peace in and for said Morton county, N. D., against one William Churchill, wherein such William Churchill was charged with threatening to shoot one Louis Goeschel with a loaded revolver and deadly weapon; that the said H. G. Voss, then being state's attorney in and for said Morton county, as hereinbefore shown, acted in regard to such complaint and action and charge against said William Churchill, as counsel and adviser of such William Churchill, and as attorney for him therein; that the said Louis Goeschel was the complaining witness in such complaint, action, and proceeding, and was compelled and did then and there employ an attorney, viz., B. W. Shaw, Esq., to conduct the prosecution thereof, and that said B. W. Shaw, Esq., did so conduct such prosecution; that the said William Churchill was by such justice held to answer in the district court for such a crime, and that thereupon the said H. G. Voss, then being state's attorney as aforesaid, with great vehemence and openly and publicly did advise the said William Churchill to repeat such offense; that thereafter the said William Churchill did further assault such Louis Goeschel with a revolver, and then and there shot at said Louis Goeschel three times with the same; that the said William Churchill was then and there under bonds to keep the peace as provided by law, which bonds the said Justice Wilder had required of such William Churchill to give in that behalf at the hearing of the complaint and action first hereinbefore mentioned; that thereupon, and after the assault upon and shooting at said Louis Goeschel by said William Churchill, as hereinbefore shown, which said acts were in violation of the conditions of his bond to keep the peace, the said H. G. Voss, then being state's attorney of Morton county, refused to prosecute the said William Churchill, criminally or otherwise, for his said conduct hereinbefore shown, or to proceed upon his bond

given as hereinbefore shown, and neglected so to do, and that such matters were never inquired of or prosecuted otherwise than as hereinbefore shown. Third. That during the years of 1896, 1897, and 1898, one George McDonald was residing at Mandan, Morton county, N. D., and engaged in the occupation of keeping and maintaining a building wherein gambling and games of chance were unlawfully carried on and conducted and indulged in as a business; that the said George McDonald and his said unlawful business and the building and rooms wherein the same was carried on and conducted were during said time known to and patronized by the said H. G. Voss, he then and there being state's attorney of said Morton county; that frequently during said years the said H. G. Voss, then and there being state's attorney, resorted to such building and place, and then and there and therein played at games of chance, and gambled and won and lost large sums of money thereat; that such games of chance so carried on and conducted by said George McDonald, as hereinbefore shown and participated in by the said H. G. Voss, he then and there being state's attorney of said Morton county, as aforesaid, so far as known by this committee, were the games designated and known as "roulette," and "playing at craps"; that during all of such time the said H. G. Voss, then being state's attorney, received from such George McDonald large sums of money, either as a consideration for not prosecuting the said George McDonald, or as sums won at the said games of chance, and upon such gambling schemes as were then and there carried on; that the said George McDonald was not prosecuted, nor did the said H. G. Voss prosecute or in any way enforce the law of the state of North Dakota against gambling, but, on the contrary thereof, encouraged and permitted such evil and misdemeanor, and for a consideration either directly paid to him by said McDonald or won by him in the practice of gambling or by resort to games of chance." This court, after the filing of such accusation with the clerk of this court and presenting to same to the court appointed the clerk of this court as referee to take the testimony on such investigation of such charges, and the Bar Association duly appointed Hon. George W. Newton to conduct such investigation before the referee and to present the matter of the disbarment of the defendant to the supreme court, after the taking of the testimony had been completed before the referee.

The defendant answered the charges and specifications preferred against him by such committee, and therein denied specifically all such charges of misconduct on his part, and averred that he had performed his duty as state's attorney and as attorney at law faithfully and conscientiously, as the same appeared to him under the laws of the state. At the outset the attorney for the prosecution frankly admits that there is no evidence in the record showing or tending to show that the defendant ever received, nor was he paid, any money or property or anything of value from any person with a view or for the purpose of wrongfully influencing his official conduct as state's attorney. Hence the misconduct urged by the prosecution as grounds for the suspension or

discipline of the accused is confined to his action pertaining to the
injunction suits brought by Mr. Voss and which were the subject-.
matter of the meeting of some of the citizens of Morton county at his
office early in January, 1898; and (2) his failure to inform against
one McDonald for keeping a gambling place after full knowledge that
such a place was maintained by such McDonald; (3) misconduct as
state's attorney in the conduct of the cases of State against Churchill
and State against Churchill and Goeschel. The testimony taken be-
fore the referee is voluminous, but there is an absence of contradiction,
so far as the material facts are concerned, and the case will be dis-
posed of upon testimony that is practically undisputed.

In January, 1898, Mr. Voss, as state's attorney, commenced 10 or
12 actions to abate nuisances alleged to have been created by the de-
fendants therein by the unlawful sale of intoxicating liquors in places
unlawfully kept by them for such sales, and for unlawfully keeping
liquors for sale in such places. These actions were brought under
section 7605, Rev. Codes 1899, by the state, on the relation of one
Christ Christianson, who was a representative of the State Enforce-
ment League of North Dakota. An injunction and a search warrant
were issued by the judge of the district court, and a search at each
place was made at the time the papers were served. Such search did
not result in the finding of any intoxicating liquors, and the places
searched were not therefore closed by the sheriff. The papers were
placed in the hands of the sheriff by Mr. Voss in the afternoon of the
day on which the judge issued the orders, and were served by the
sheriff on the same day. The sheriff's fees for such searches and ser-
vice of the papers amounted to nearly $200, and he presented his bill
therefor to Mr. Voss, for his approval thereof, before it was presented
to the board of county commissioners for allowance. Mr. Voss re-
fused to approve of the bills, claiming that the county was not liable
for their payment until judgment had been rendered against the
county. The sheriff then went to the secretary of the Citizens' Pro-
tective Association of Mandan to consult with him concerning the
payment of his fees. This association is composed of the business men
of Mandan. It was organized for the purpose of furthering the busi-
ness interests of the city of Mandan, and had a membership of 67
business men. Mr. Voss was not a member of such association.    A
large majority of this association was opposed to the enforcement of
the prohibition law in Mandan, and favored a license system and
protection from prosecution, under which the city derived a revenue
from those engaged in the unlawful sale of beverages. Pursuant to
the interview of the sheriff with the secretary of this association, as
to the payment of his bill for serving the papers in these actions, the
secretary called a meeting of the association, and a meeting thereof
was immediately held in a room back of the secretary's store. At this
meeting the question of the payment of the sheriff's fees was con-
sidered, and it was there decided to call upon Mr. Voss to ascertain
why he objected to the sheriff's bills being paid by the county. They
called upon Mr. Voss on the following day, when Mr. Voss explained

to them why he objected to the payment by the county of such fees. He there gave the same reasons that he had previously given the sheriff, viz., that the county was not liable until a judgment of dismissal had been rendered in the actions. Thereupon a general discussion followed as to the course to be pursued in reference to the actions and the payment of the sheriff's fees. Some favored that the law should take its course, and that the actions be prosecuted; others favored no prosecutions of the actions; others favored that the county should pay the costs; others that the defendants should pay them. Mr. Voss was not present during the whole hour during which this meeting lasted, he having been called away and remained out until the meeting had closed and the parties were dispersing. At this meeting the sheriff's bill was corrected, as it contained overcharges, and Mr. Voss read from the statute what the legal fees were for the various items included in the sheriff's bill. He also stated that the sheriff had found no intoxicating liquors on the search, and that he had no evidence warranting the closing of the places. At this meeting it was decided that the defendants in these actions must pay the sheriff's fees, and it was there decided that each defendant must pay $17.50. It was understood, as the general sentiment of the meeting, that in case any defendant paid such sum that his case would be dropped, and in case any defendant refused to pay such sum the action was to be prosecuted against him. No witness states that Mr. Voss was a party to such proposed action nor made any promises to drop the actions. He states that he made no promises to drop the actions, and that no one asked him to do so. He does state that he was not aware that defendants paid such costs until some time thereafter. However, a committee was appointed at this meeting to collect such sum from each of the defendants, and all of them paid such sum, excepting one defendant, who refused, and his place was closed, but not under instructions from Mr. Voss. The front door was locked, but such defendant remained in possession, and had access to his building through a side entrance. Mr. Voss never took any further action whatever in these actions.

It is our conclusion that he acquiesced in the action of the meeting at his office, and, in conformity to the sentiment and wishes of the majority at that meeting, took no further action on the cases, and did not intend to. We cannot find from a reading of the evidence that he did not know that it was the sentiment of that meeting that the prosecutions should be dropped and discontinued. The attendance at this meeting was 14. It lasted one hour. There was much discussion. Mr. Voss participated in such discussion while present, and he was present a considerable portion of the time. Mr. Voss knew that the county was not thereafter asked to pay such fees, and must have known that the reason for ascertaining the correct amount of such fees in each case was that it was intended by the meeting that the defendants were to pay such sum. The defendants were not liable for the payment of such costs at that time. On what theory did they pay

such sum, except on the condition that the actions were not to be further proceeded with? None other is apparent nor suggested. In the Yunck case a demurrer was interposed by the defendant and served on Mr. Voss, but never noticed for argument, nor ever argued. Mr. Rice, an attorney, asked Mr. Voss' consent to give him time to brief up certain law questions which he desired to raise in the cases, and Mr. Voss consented that the cases should be continued over the April term, and that Mr. Rice might serve answers or demurrers at any time before the April term. The actions were commenced early in January. Mr. Rice never served any answers or demurrers; hence the cases were in default of an answer in April. Judgment could have been applied for, and on producing evidence to the court of the maintenance of a nuisance by the unlawful sale or keeping for sale of intoxicating liquors by the defendants, the actions would have been decided in an orderly manner, either by the granting of a permanent injunction and a decree declaring the defendants guilty of maintaining a nuisance or by a dismissal of the actions for the want of evidence to warrant such a decree. It is proven in this record beyond question that some, if not all, of these defendants were engaged in openly running saloons where intoxicating liquors were sold by them. It cannot be entertained for a moment that evidence could not be produced to the court, under such circumstances, sufficient to warrant a decree in favor of the plaintiff. No attempt was made to do so. Undoubtedly there was a strong sentiment in Mandan against the enforcement of the prohibition law, but we lay no stress upon the contention made that efforts to enforce the law by actions such as these under consideration would be futile, as such contention is no less than an assertion that the citizens of Mandan and Morton county would perjure themselves rather than permit the enforcement of the prohibition law. Such a contention is not worthy of consideration or mention. Had Mr. Rice been permitted to serve answers, no different result would follow. The actions were equitable ones, and triable to the court, and it cannot be entertained that sufficient evidence could not have been procured. At all events, no efforts were made to do so, and we could not hold the defendant to be without culpable blame unless he had made a determined effort to do so and had failed. The evidence justifies the conclusion that the defendant did not force the prosecution of these actions to judgment, because he deferred to the action of the committee while in his office that the actions were to be dropped and not prosecuted. This was a violation of his duty as state's attorney, and, consequently, a violation of his duty as an attorney at law, and is highly reprehensible. The duties of state's attorney are to be performed regardless of public sentiment, and he who administers that office in deference to sentiment opposed to the law is unfit to hold that office or to be an attorney at law. It is not meant by us that state's attorneys are to furnish evidence of violations of the law, nor are they to act as detectives in order to further prosecutions. Such action is not, in our judgment, contemplated by the statute. But it

is his duty to force arguments on law matters to a decision without being prompted, and if he knows of no evidence to warrant decrees in default cases the relator should be called on to produce the necessary proofs, and the state's attorney's failure to act in such cases is not excused on the ground that public sentiment is hostile to the enforcement of the law, or that convictions are difficult to obtain on account of such sentiment. This question was asked of Mr. Voss: "If there has been any act or neglect to act on your part which might be construed as a neglect to enforce either of these laws, was that act or neglect to act brought about by what appeared to you the exigency of the case, taking into consideration the general sentiment and feeling of the community?" He answered: "Yes, sir; I realized the fact through the years I have been public prosecutor that a penal statute does not rise above the sentiment back of it." The sentiment of the community respecting the enforcement of a law should not be the test as to whether it is to be enforced or not. State's attorneys are not permitted to thus practically repeal laws deemed obnoxious by their constituents. Their duty lies in the direction of attempting the enforcement of all laws when violations are properly brought to their attention. We do not understand that mere inaction by a state's attorney in enforcing the prohibition law, when he is not asked to take action on evidence produced to him, is a violation of his duties. But to virtually dismiss actions commenced in response to the wishes or arrangements of those opposed to the enforcement of that law is quite another question, and to so act when there is evidence in his possession to warrant an attempt to secure judgment is, in our judgment, acting under wrong motive, and in direct violation of the oath of office taken by him, and consequently a violation of his duties as an attorney at law. It is a palpable neglect to prosecute a violation of that law as directed by section 7604, Rev. Codes 1899, and is a misdemeanor under the provisions of section 7620, Rev. Codes 1899, under which he might have been removed from his office. It involved a violation of an express statute, and is a misdemeanor involving moral turpitude. In so holding we are following a prior decision of this court, although such decision was not upon facts entirely similar to the facts of this case. See In re *Simpson*, 9 N. D. 379, 83 N. W. Rep. 541. This instruction was given to a jury by the chief justice of the supreme court of Kansas in a proceeding before that court to remove a county attorney from office, viz.: "A county attorney cannot be controlled by the wish or sentiment of the people of his county in the prosecution of the violators of the law. A county is a political division of the state, and the county attorney, within his county, is a representative of the state. After he has commenced prosecutions under the prohibitory act against parties guilty of the violations of the provisions of that law and has been furnished with the names of witnesses by whom the violations can be proved, he is not to be deterred from his duty by mere public clamor." *State* v. *Foster,* 32 Kan. 41, 3 Pac. Rep. 537. In the same opinion it is said by that court: "After the utterance of this oath, he cannot sit down

with folded hands and refuse to perform the duties imposed upon him solely upon the ground that the sentiment of the community or county in which he resides is in opposition to the enforcement of the criminal laws of the state. Such action on his part would tend to increase lawlessness. Under such doctrine, the more lawless the community, the less the criminal prosecutions." Again, in the charge on page 34, 32 Kan., the chief justice said: "No actual corruption or bribery need be established. If he was influenced to dismiss the case by a desire to shield and protect the persons against whom he had filed complaints from punishment for their acts, your verdict should be for the state."

The evidence disclosed that the defendant, while state's attorney, engaged in gambling in a public gambling house. He engaged in gambling for money on the roulette wheel, and engaged in playing craps for money. This the defendant admits, but insists that he did so on a few occasions only, and for small sums. If true, we do not deem that to be a defense of controlling importance. But there is evidence of several witnesses that he frequently engaged in such games, and for sums of money that some of them considered large, during the fall of 1898. The evidence does not show that he was a regular patron at the McDonald gambling place, but that he was there frequently during the fall of 1898 is not denied by him, and that he gambled there on several occasions during that time is proven. The prosecution insists that such conduct is ground for disbarment, under the provisions of section 433 of the Political Code, which provides that the license of an attorney at law may be revoked or suspended; "(1) When he has committed a felony or misdemeanor involving moral turpitude." Section 7243, c. 37, Rev. Codes 1899, pertaining to gaming, provides that: "It is the duty of all sheriffs, police officers, constables and prosecuting or state's attorneys to inform against and prosecute all persons whom they have credible reason to believe are offenders against the provisions of this chapter and any omission so to do is punishable by a fine not exceeding five hundred dollars." Neglecting to inform against the keeper of this gambling house under such section is made a misdemeanor. To inform against such keeper, when he had positive evidence of guilt, was the duty of the defendant, and his failure to do so was a plain violation of his official duty. Whether such misdemeanor committed by him was one involving moral turpitude remains to be considered.

Gambling is an act beyond the pale of good morals, and is an evil practice under any circumstances, though it does not necessarily involve moral turpitude. But the misconduct charged against the defendant is not that of gambling, but a failure to prosecute the keeper of such a place after having knowledge that he kept a place containing gambling devices. The charge is that he refrained from prosecuting, from corrupt motives, after having received money from such keeper as a consideration for his not being prosecuted. There is no evidence that he received money from such person with any such object. But that does not alter the situation nor justify his conduct.

He did not inform against such person nor prosecute such person. His answer is that no one asked nor requested him to prosecute. The statute contemplates that he shall make a complaint himself. In this class of cases he must become informant and prosecutor when he has knowledge of guilt or credible reason to believe that such offense has been or is being committed. The section imposes an un-usual duty upon state's attorneys—one requiring them, under penal-ties, to institute criminal proceedings in such cases. By accepting the office of state's attorney, this duty is assumed, as well as other and more agreeable duties. To violate such duty is a violation of and an utter disregard of his oath of office. The commission of a misdemeanor that necessarily, by its commission, includes a violation of an oath of office, is committing a misdemeanor that involves moral turpitude. Though not perjury in a technical sense, it still involves the violation of an oath, and there can be no wilful violation of an oath that does not carry with it a disregard of principle and law amounting to moral turpitude.

On June 14, 1895, one Louis Goeschel made a complaint against one William Churchill before Frank Wilder, Esq., a justice of the peace, charging said Churchill with threatening to do bodily harm to said Goeschel, and prayed that said Churchill be placed under bonds to keep the peace. Mr. Voss first appeared on behalf of the state. The warrant was issued by the justice without consultation with Mr. Voss. Upon coming into court Mr. Voss moved that the defendant be dismissed, upon the ground that he had made an investigation of the facts and found that the defendant had committed no offense and was justified in doing what he did. The justice refused to dismiss the case. Thereupon the complaining witness asked the court to be allowed to retain private counsel, as Mr. Voss was representing the defendant. Mr. Voss consented to this, and Mr. Shaw thereafter conducted the prosecution. Mr. Voss, however, remained in the case, and took some part in the examination. During the hearing, Mr. Voss seemed to direct all his efforts to show that the defendant was blameless and justifiable in what he did. He held consultations with the defendant during the hearing. The defendant had no attorney, and seemed to look to Mr. Voss for advice. Mr. Voss and the de-fendant stepped aside or away from the parties in the room, and held several consultations during the hearing. The justice testifies as to his conduct at the hearing: "I don't think he took any witness and went through a regular cross-examination or examination, but he would shy in a question now and then. I want to state that Mr. Voss claimed and said all the time that he did not take any sides in the case, but as a matter of fact, he was so prejudiced in favor of the defendant that he could not keep from shying in remarks and ques-tions, and Mr. Voss started in with the idea that the matter ought to be dismissed at once, and the further he progressed he more earnest he became in that opinion, and finally lost all control of his temper, and proceeded along that line." The justice further testifies: "Of course, when he brought in those remarks and whisperings I

called him down a little, and he then made the statement that he was not taking any sides in the case, but wanted to sift the matter to the bottom, but pretty soon he would be over in the position of the defendant's attorney." After one of the defendant's witnesses was sworn, Mr. Voss told him to go on and tell what he knew about the case. At the conclusion of the taking of testimony both Mr. Voss and Mr. Shaw addressed the court, Mr. Voss contending that the defendant should be discharged. The court placed the defendant under bonds to keep the peace. Upon this decision being announced, Mr. Voss "spoke quite sharply and vehemently," and denounced the decision of the justice as an "outrage." Afterwards Mr. Voss and the complaining witness had a bitter personal altercation in open court, highly discreditable to both, and highly contemptuous to the court.

It is impossible to read the evidence of the justice and other witnesses, including that of Mr. Voss, without being convinced that Mr. Voss went further than his official duty demanded, even if it be conceded that he conscientiously believed that the defendant should not have been placed under bonds. He showed the most intense prejudice in favor of the defendant and against the prosecution. If he in good faith believed, after thorough investigation, that the defendant was not guilty as charged, then it was his duty to move the dismissal of the case. But his duty ended with such motion, and he had no right to remain in the case thereafter for the purpose of assisting the defendant, directly or indirectly. His conduct is more open to criticism by reason of the fact that the defendant in that case was the hired man of and acting under instructions of one Barrows. Barrows and the complaining witness, Goeschel, were having a lawsuit over some property matters, and it was in reference to such property that Churchill and Goeschel had the trouble that culminated in Churchill's being placed under bonds to keep the peace. Mr. Voss was Barrows' attorney in this civil case. Goeschel and Mr. Voss were and are the bitterest of enemies. It further appears from the evidence that Mr. Voss had not in his investigations talked with Goeschel as to the origin of the trouble, nor as to his version as to the truth of the affair. At the origin of the trouble, no one was present save the two participants. Hence Mr. Voss' statement to the court in the motions, that he had thoroughly investigated the trouble, was not true. Everything connected with this hearing tends to show that Mr. Voss lent his assistance to the defendant and was opposed to a prosecution. He assisted the defendant when his duty was to assist the state. If he could not conscientiously, and consistently with his official and professional honor, assist the state, he should have left the court room after making his motion to dismiss, and not have remained there virtually in the interests of the defendant. The justice was not bound to grant Mr. Voss' motion to dismiss the case. Perhaps it might be good practice to do so in ordinary cases, but he need not do so as a matter of right. In *People* v. *Ward,* 85 Cal. 585, 24 Pac. Rep. 785, it is said in the syllabus: "A justice of the peace has power to determine whether or not a criminal action brought before him shall be

dismissed, and is not bound to obey the order of the district attorney for such dismissal." His conduct in reference to this case throughout was censurable, and tended to bring courts of justice into disrepute. The statute enjoins upon attorneys the duty of maintaining the respect due to courts of justice, and makes a wilful violation of such duty ground for disbarment. Throughout this hearing he went beyond the bounds of propriety as enjoined by the statute and professional ethics, and flagrantly violated both. In *People* v. *Spencer,* 61 Cal. 130, it is said: "But, independent of the statute, there can be no doubt that his conduct was reprehensible. By appearing both for plaintiff and defendant in the same action, he was guilty of 'a violation of his duty as an attorney,' for which it is our duty to remove or suspend him. Code Civ. Proc. § 287. Neither his ignorance of the laws, nor the crudity of his notions of professional ethics, can excuse an offense against professional propriety by one whose duty it is to assist in the administration of justice. The degree of turpitude involved in the breach of his duty by an attorney, however, must appear in the circumstances of each case. * * * However innocent his motives, his conduct must be condemned."

After the defendant in that case was bound over to keep the peace, he and Goeschel had another encounter, in which each used firearms, in an endeavor to kill or disable the other by shooting at each other. One shot resulted in one of the participants being wounded, but not very seriously, although several shots were fired. Mr. Voss caused the arrest of both, and both were bound over to the district court on some minor charge. The cases yet remain undetermined. It is claimed by the prosecution that Mr. Voss was derelict in his duties in not bringing an action on the bond given by Mr. Churchill to keep the peace a few weeks before this last-mentioned encounter. We shall not attempt to determine which person was the aggressor on this last occasion. The record is full of incompetent and hearsay evidence that should be stricken out and not considered. For instance, one Barry, a witness to a part of the affray, is now dead. Still, his version of the case is on the record. Mr. Churchill has left the jurisdiction, and his whereabouts are unknown. Still, his version of the trouble, as told by him to one witness, is spread upon the record. These things are mentioned to show why we are unable to determine who was at fault as respects the last trouble between the parties. Mr. Voss says that he investigated the case thoroughly, and deemed it his duty not to forfeit Churchill's bond and bring an action thereon. We have no reason to dispute this statement, and do not do so. We remark, however, that this last-mentioned trouble should not have been allowed to go unprosecuted. One of the participants was to blame and should have been punished. Each of these three derelictions of duty pertain to Mr. Voss' actions as state's attorney.

No charges have been preferred, nor does the evidence disclose any personal misconduct, except his acts of gambling; nor is any charge preferred, nor does the evidence show any misconduct in his professional experience as an attorney at law. It is gratifying that

we are able to say this. But his course as a state's attorney, in the matters herein set forth, cannot be allowed to pass without condemnation. He held the office of state's attorney by virtue of his having a license from this court to practice law, and any deviation from the line of proper deportment in the office of state's attorney is equally a deviation from the line of proper deportment as an attorney at law. It cannot be successfully maintained that criminal conduct on his part as state's attorney cannot be used as evidence to take from him the authority under which he practices law, and under which he exercises the functions of state's attorney, whereas a person may commit some offenses not connected with his duties as an attorney at law, when such offenses do not unfit him for the practice of his profession and render him unworthy of the confidence of clients, and no ground exists for disbarring him. In such cases the man and the attorney at law are deemed separate, and an act that may reflect seriously upon the character of the man will not be grounds for disbarment or suspension. But it is not true that corrupt conduct on the part of a state's attorney in his professional capacity will not constitute cause for disbarment or suspension as an attorney and counselor at law. Our conclusion is that the misconduct shown would justify disbarment. But in view of the circumstances and the fact that the attorney in charge of the prosecution does not ask for a disbarment, and in view of the fact that the ends of justice will in our opinion be subserved by a more lenient judgment than that of disbarment, we will not inflict the severest penalty.

In view of the evidence we conclude that the defendant should be temporarily suspended from practicing as an attorney and counselor at law in all the courts of this case. The judgment of the court is that the defendant be suspended from the practice of law in all the courts of this state for the period of nine months from the 23rd day of April, 1902, and that he be reinstated at the end of such period without further action on the part of this court, unless, prior to the expiration of such period, a written statement shall be filed with the clerk of this court, signed by a majority of the prosecuting committee of the State Bar Association, setting forth that the defendant has been guilty of misconduct showing that he is not worthy nor enitled to be reinstated, or has violated the mandate of this court herein, during the period of his suspension. All concur.